IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KEENAN H. MEADORS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 20-CV-595-CVE-SH |
| | ) | |
| INDEPENDENT SCHOOL | ) | |
| DISTRICT NO. 1 OF TULSA | ) | |
| COUNTY, OKLAHOMA, | ) | |
| | ) | |
| Defendant. | ) | |

**OPENING BRIEF IN SUPPORT OF THE
TULSA SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT**

/s/ M. Scott Major
Eric D. Wade, OBA No. 19249
M. Scott Major, OBA No. 33957
ROSENSTEIN, FIST & RINGOLD
525 South Main, Suite 700
Tulsa, OK 74103
(918) 585-9211 – telephone
(918) 583-5617 – facsimile
ericw@rfrlaw.com
scottmajor@rfrlaw.com

ATTORNEYS FOR DEFENDANT
INDEPENDENT SCHOOL DISTRICT
NO. 1 OF TULSA COUNTY, OKLAHOMA

November 3, 2023

# TABLE OF CONTENTS

THE UNDISPUTED MATERIAL FACTS ("UNDISPUTED FACTS")........................................3

ARGUMENTS AND AUTHORITIES ..................................................................................17

    SUMMARY JUDGMENT STANDARD ..........................................................................17

PROPOSITION I ...............................................................................................................18

  MEADORS CANNOT RECOVER FOR ALLEGED TITLE VII
  VIOLATIONS FROM 2017 ...............................................................................................18

PROPOSITION II ..............................................................................................................20

  THE DISTRICT IS ENTITLED TO JUDGEMENT AS A MATTER OF
  LAW ON MEADORS' AGE DISCRIMINATION CLAIM ................................................20

    A.  MEADORS ADMITS THAT AGE WAS NOT THE REASON HE
        WAS NOT HIRED .................................................................................................21

    B.  THE PRIMA FACIE CASE ....................................................................................22

    C.  LEGITIMATE, NONDISCRIMINATORY REASONS AND PRETEXT
        ANALYSIS ............................................................................................................22

PROPOSITION III .............................................................................................................27

  THE DISTRICT IS ENTITLED TO JUDGMENT AS A MATTER OF
  LAW ON MEADORS' TITLE VII RETALIATION CLAIM ..............................................27

    A.  MEADORS CANNOT ESTABLISH A PRIMA FACIE CASE
        OF RETALIATION .................................................................................................27

    1.  PROTECTED ACTIVITY AND ADVERSE ACTION ...............................................27

    2.  CAUSAL CONNECTION........................................................................................28

PROPOSITION IV ....................................................................................................29

THE DISTRICT PROVIDED MEADORS ALL REQUIRED DUE PROCESS
    PROTECTIONS AND RIGHTS WHEN HIS POSITION WAS ELIMINATED;
    HE HAD NO PROPERTY INTEREST IN NEW EMPLOYMENT ...................................29

    A.  PROCEDURAL DUE PROCESS .......................................................................29

    B.  SUBSTANTIVE DUE PROCESS ......................................................................31

    C.  THE BOARD'S ACTIONS DO NOT SHOCK THE CONSCIENCE ............................32

    D.  MEADORS HAD NO PROTECTED INTEREST IN NEW EMPLOYMENT...............33

PROPOSITION V ......................................................................................................33

    MEADORS' CLAIMS FOR BREACH OF FIDUCIARY DUTY UNDER
    ERISA FAILS AS A MATTER OF LAW BECAUSE GOVERNMENT EMPLOYEE
    BENEFIT PLANS ARE EXEMPT UNDER ERISA .............................................33

PROPOSITION VI ....................................................................................................34

    MEADORS CANNON RECOVER PUNITIVE DAMAGES
    AGAINST THE DISTRICT.............................................................................34

CONCLUSION ........................................................................................................35

## TABLE OF AUTHORITIES

### CASES

*Anaeme v. Diagnostek, Inc.*,
  164 F.3d 1275 (10th Cir. 1999) ..........................................................................22

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................... 17-18

*Aramburu v. The Boeing Company*,
  112 F.3d 1398, 1408 n.7 (10th Cir. 1997) .............................................................25

*Argo v. Blue Cross & Blue Shield of Kansas, Inc.*,
  452 F.3d 1193, 1202 (10th Cir. 2006) ..................................................................27

*Bd. of Regents of State Colleges v. Roth*,
  408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) ..............................................30

*Bishop v. Wood*,
  426 U.S. 341 (1976) ......................................................................................32

*Brenna v. Southern Colo. State College*,
  589 F.2d 475 (10th Cir. 1978) ...........................................................................32

*Browder v. City of Albuquerque*,
  787 F.3d 1076 (10th Cir. 2015) .........................................................................29

*Bruno v. Western Elec. Co.*,
  829 F.2d 957 (10th Cir. 1987) ...........................................................................34

*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006) ......................................................................................27

*Burrus v. United Tel. Co. of Kan., Inc.*,
  683 F.2d 339 (10th Cir.1982) ...........................................................................28

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ....................................................................................17

*Cleveland Bd of Educ. v. Loudermill*,
  470 U.S. 532 (1985) ....................................................................................30

*Cnty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998) ....................................................................................32

*Coleman v. Darden,*
  595 F.2d 533 (10th Cir.) ........................................................................29, 33

*Collins v. Harker Heights,*
  503 U.S. 115 (1992) ..................................................................................32

*Committee for the First Amendment v Campbell,*
  962 F.2d 1517 (10th Cir. 1992) ............................................................... 18

*Conner v. Schnuck Markets, Inc.,*
  121 F.3d 1390 (10th Cir. 1997) .................................................................23

*Corneveaux v. Cuna Mut. Ins. Group,*
  76 F.3d 1498 (10th Cir. 1996) ..................................................................22

*Curtis v. Okla. City Pub. Sch. Bd. of Educ.,*
  147 F.3d 1200 (10th Cir. 1998) .................................................................32

*Davidson v. America Online, Inc.,*
  337 F.3d 1179 (10th Cir. 2003) .................................................................19

*Dill v. City of Edmond,*
  155 F.3d 1193 (10th Cir. 1998) ............................................................ 34-35

*Doe v. Woodard,*
  912 F.3d 1278 (10th Cir. 2019) .................................................................33

*Ft. Bend Cnty. v. Davis,*
  139 S. Ct. 1843 (2019) ..............................................................................19

*Gad v. Kansas State. Univ.,*
  787 F.3d 1032, 1040 (10th Cir. 2015) ................................................... 18-19

*Giannopoulos v. Brach & Brock Confections, Inc.,*
  109 F.3d 406 (7th Cir. 1997) ....................................................................24

*Graham v. Hartford Life & Accident Ins. Co.,*
  589 E.3d 1345 (10th Cir. 2009) .................................................................34

*Gross v. FBL Fin. Servs., Inc.,*
  557 U.S. 167 (2009) ..................................................................................21

*Hardy v. S.F. Phosphates Ltd. Co.,*
  185 F.3d 1076 (10th Cir. 1999) .............................................................22, 24

*Hazen Paper Co. v. Biggins,*
  507 U.S. 604 (1993) ................................................................................................21

*Ingles v. Thiokol Corp.,*
  42 F.3d 616 (10th Cir. 1994) ...............................................................................26

*Johnson v. Spirit Aerosystems, Inc.,*
  20-CV-00138-GKF-CDL, 2022 WL 1174120, (N.D. Okla. Mar. 24, 2022) ............19

*Johnson v. Spirit Aerosystems, Inc.,*
  22-5028, 2022 WL 13631886 (10th Cir. Aug. 12, 2022) ........................................19

*Jones v. Okla. City Pub. Sch.,*
  617 F3d 127, 1277 (10th Cir. 2010) ....................................................................21

*Jones v. Unisys Corporation,*
  54 F.3d 624 (10th Cir. 1995) .................................................................................22

*Kendrick v. Penske Transportation Services,*
  220 F.3d 1220, n.11 (10th Cir. 2000) ....................................................................25

*Lenz v. Dewey,*
  64 F.3d 547 (10th Cir. 1995) .................................................................................30

*Lincoln v. BNSF Ry. Co.,*
  900 F.3d 1166 (10th Cir. 2018) .............................................................................19

*Martinez v. Potter,*
  347 F.3d 1208 (10th Cir. 2003) ...................................................................... 19-20

*Matsushita Electric Industries, Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ........................................................................................... 17

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973) .............................................................................................22

*Milton v. Scrivner, Inc.,*
  53 F.3d 1118 (10th Cir. 1995) ...............................................................................25

*Montes v. Vail Clinic, Inc.,*
  497 F.3d 1160 (10th Cir. 2007) ...........................................................................19

*Montgomery v. City of Ardmore,*
  365 F.3d 926 (10th Cir. 2004) .......................................................................... 30-31

v

*Morgan v. Hilti, Inc.*,
108 F.3d 1319 (10th Cir. 1997) ...............................................................................23, 25

*National Railroad Passenger Corporation v. Morgan*,
536 U.S. 101 (2002) ...............................................................................................20

*Palzer v. Coxcom, LLC*,
15-CV-00564-GKF-JFJ, 2019 WL 11585348, (N.D. Okla. Sept. 17, 2019) ...............................20

*Palzer v. CoxCom, LLC*,
833 Fed. Appx. 192 (10th Cir. 2020) ...............................................................................20

*Perez v. Unified Gov't of Wyandotte Cnty./Kan. City, Kan.*,
432 F.3d 1163, 1168 n.4 (10th Cir. 2005) ...............................................................................33

*Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*,
858 F.3d 1324 (10th Cir. 2017) ...............................................................................28

*Rea v. Martin Marietta Corporation*,
29 F.3d 1450 (10th Cir. 1994) ...............................................................................23

*Richmond v. ONEOK, Inc.*,
120 F.3d 205 (10th Cir. 1997) ...............................................................................28

*Riggins v. Goodman*,
572 F.3d 1101 (10th Cir. 2009) ...............................................................................30-31

*Ripley v. Wyo. Med. Ctr., Inc.*,
559 F.3d 1119 (10th Cir. 2009) ...............................................................................30

*Romig v. City of Iola, Kansas*,
34 F. Supp. 2d. 1265 (D. Kan. 1998) ...............................................................................25-26

*Seibert v. Univ. of Okla. Health Sciences Center*,
867 F.2d 591 (10th Cir. 1989) ...............................................................................31

*Selenke v. Med. Imaging of Colorado*,
248 F.3d 1249 (10th Cir. 2001) ...............................................................................23

*Texas Department of Community Affairs v. Burdine*,
450 U.S. 248 (1981) ...............................................................................22

*Town of Castle Rock, Colo. v. Gonzales*,
545 U.S. 748 (2005) ...............................................................................30

*Uhlrig v. Harder*,
   64 F.3d 567 (10th Cir. 1995) ................................................................................ 32-33

*West v. Grand Cnty.*,
   967 F.2d 362 (10th Cir. 1992) ................................................................................. 30

*Wilkerson v. Shinseki*,
   606 F.3d 1256 (10th Cir. 2010) ............................................................................... 21

## **STATUTES**

29 U.S.C. § 623 ............................................................................................................ 21

29 U.S.C. § 1001 ...................................................................................................... 33-34

29 U.S.C. § 1002 ......................................................................................................... 34

42 U.S.C. § 2000e-5 ..................................................................................................... 34

OKLA. STAT. tit. 51, § 152 ............................................................................................. 34

OKLA. STAT. tit. 51, § 154 ............................................................................................. 25

OKLA. STAT. tit. 70, §§ 6-101.40 - 6-101.47 .............................................................. 30-31

OKLA. STAT. tit. 70, § 17-101 ........................................................................................ 34

OKLA. STAT. tit. 74, §§ 1301–1328 ................................................................................ 34

## **OTHER AUTHORITIES**

1987 OK AG 144 .......................................................................................................... 34

2003 OK AG 15 ............................................................................................................ 34

The defendant, Independent School District No. 1 of Tulsa County, Oklahoma (the "Tulsa School District" or "District"), respectfully submits this opening brief in support of its Motion for Summary Judgment (Dkt. 86).

In August 2010, the plaintiff, Keenan Meadors ("Meadors"), became employed as a Police Officer with the Tulsa School District's Police Department ("Campus Police"), and he was promoted to Sergeant in 2015. In September 2017, he intentionally covered a security camera, at least twice, on District property despite being previously directed to not do so. As a result, a recommendation was made to terminate his employment. At the conclusion of his pre-termination due process hearing before the Board of Education ("Board"), Meadors was not terminated but was demoted from Sergeant to Police Officer.

To assist Meadors in meeting the standards of job performance and conduct expected of a Police Officer, the District issued a Personal Development Plan ("PDP") to him after his demotion. However, Meadors continued to engage in many behaviors that he was directed to avoid. Despite these continuing deficiencies in his job performance and conduct, Campus Police leadership continued to provide coaching and support to Meadors to help him improve.

In April 2019, Superintendent Deborah Gist ("Gist" or "Superintendent"), recommended a District-wide reorganization of several departments ("Reorganization") to the Board, which included the proposed elimination of over 179 positions of employment, including **all** Police Officer positions, and the nonreemployment of administrative and support employees, including **all** Police Officers (such as Meadors), employed in those positions, effective July 1, 2019. Gist's recommendation was based solely on the positions and had nothing to do with the job performance of the individuals employed in those positions. As part of the proposed Reorganization, Gist also

1

recommended the creation of certain new positions, including but not limited to, School Safety Officer ("SSO") positions in Campus Police.[1]

Like all similarly situated employees, Meadors was given written notice of Gist's proposed Reorganization, including notice of the proposed elimination of his position and nonreemployment, and his right to a due process hearing before the Board. Meadors received a due process hearing on May 23, 2019, and was represented by his union advocate. At the conclusion of the hearing, the Board approved the Reorganization, including the elimination of 179 affected positions and the nonreemployment of administrative and support employees in those positions, including **all** Police Officers, like Meadors. The Board also approved the creation and funding of 207 new positions, including SSO positions.

Under the collective bargaining agreement between the District and its support employee union, of which Meadors was a member, all support personnel vacancies must be posted at least one week to allow time for applications, before the vacancies can be filled.

Meadors applied for employment as a SSO. Applicants for the SSO positions, including Meadors, interviewed with a panel and the District's Chief Operations Officer, Jorge Robles ("Robles"), and were scored on a rubric. Members of the District's leadership team then met to discuss the applicants and made hiring recommendations for those applicants deemed to be a "good fit" for the position. Because of his low interview scores and history of poor job performance and misconduct, Meadors was not hired as a SSO.

---

[1] Under Board Policy 4202, positions could only be eliminated and created by the Board upon recommendation from the Superintendent or her designee. Policy 4202 further provided that an increase in duties or addition/change to a job description as the basis for increased compensation would be deemed a "new" position. The proposed Reorganization changed several job descriptions and increased pay for certain positions—including positions in Campus Police.

Ignoring his past misconduct and believing himself to be a superior applicant and victim of prejudice, Meadors filed a Charge of Discrimination alleging the District did not hire him in retaliation and in violation of Title VII because he (1) reported perceived sexual harassment and misconduct of two supervisors in February 2017, and (2) rejected an "embrace" from Gist. He also claimed the District violated Title VII and the Age Discrimination in Employment Act ("ADEA") because he was not hired as a SSO. The EEOC was unable to conclude a violation occurred. Meadors then filed this lawsuit and added claims for violating his right to due process and breach of fiduciary duty under the Employee Retirement Income Security Act ("ERISA").

The District now moves for summary judgment. The undisputed facts establish that neither Meadors' age nor a desire to retaliate against him played any role in the Reorganization or decision not to hire him as a SSO. Meadors cannot produce direct evidence of discrimination or retaliation, nor establish a *prima facie* case of either because the Reorganization and the District's decision to not hire him were based on at least **sixteen** (16) legitimate, non-discriminatory reasons or "factors." Further, he was afforded all due process required by law in connection with the Reorganization, he was owed no due process in connection with the hiring decision, and "governmental plans" are excluded from ERISA. Thus, Meadors has failed to state a claim upon which relief can be granted for violation of his due process rights and breach of fiduciary duty, and the District is entitled to judgment as a matter of law.

### The Undisputed Material Facts ("Undisputed Facts")

1.    After retiring from the Tulsa Police Department, Meadors was hired by the District in August of 2010 as a Police Officer and later promoted to Sergeant in 2015. Meadors' Depo., 30:20–24, 34:17–19, 42:24–43:8, 45:25–46:7 (Ex. 1).

3

2.      Meadors participated in the Oklahoma Teachers' Retirement System ("OTRS") and selected HealthChoice medical insurance. Meadors' Depo, 201:20–202:8, 205:12–207:10 (Ex. 1); OMES HealthChoice and OTRS Conf. Stmts., (Ex. 2); Aff. Of Kristy Amos, ¶¶ 3–4 (Ex. 3).

3.      On February 22, 2017, Meadors made informal complaints, without any first-hand knowledge, of retaliation and sexual harassment/misconduct against then-Deputy Chief Matthias Wicks ("Wicks") and then-Chief of Police, Robert Swain ("Swain"). Meadors' Depo., 103:20–111:11 (Ex. 1); 2017 Hum. Rts. Investigation Rep., "Appendix A," pp. 1–2, 11–14 (Ex. 4); 2017 Hum. Rts. Investigation Summary, (Ex. 5); Am. Compl. [Dkt. 30], ¶¶ 23, 31–32. Meadors alleged that Wicks and Swain acted as a female administrator's "supervisory hitmen" when they "fraudulently present[ed] an altered version of the collective bargaining agreement" to retaliate against a different Police Officer due to a "pattern of perceived relationships." The "root" of the complaint was Meadors' disapproval of Wicks and Swain being alone in rooms with female coworkers. He also complained Wicks sexually-harassed a Campus Police employee. Meadors' Depo., 106:2–108:3 (Ex. 1); 2017 Hum. Rts. Investigation Rep., BS #'s 001673–1675 (Ex. 4). A formal investigation was conducted by Dr. Pauline Harris, who found no evidence corroborating his allegations. 2017 Hum. Rts. Investigation Rep., BS #'s 001669–1670, 001693–1694 (Ex. 4).

4.      In May of 2017, Meadors applied to be Chief of Campus Police, but Wicks was selected instead. When Meadors was told he would not be selected as Chief during the interview process, he began actively opposing Wicks becoming Chief by signing and soliciting signatures for a "Letter of No Confidence" in Wicks' leadership. Some signatories later withdrew their names, complaining Meadors "bullied" them into signing. No Confidence Letter, (Ex. 6); Meadors' Depo., 65:5–7, 78:21–84:12, 87:16–90:17 (Ex. 1); Wicks' Depo., 36:16–37:14, 39:2–40:6 (Ex. 7).

5.      In August of 2017, Wicks gave Meadors some informal "coaching" to correct his unprofessional attitudes and behaviors, including insubordination, interrupting his superiors, using

4

a raised tone of voice and speaking in an accusatory manner toward his supervisors, having a negative attitude, and using the police radio to inappropriately lecture a coworker. Meadors was informed his behavior was harmful to Campus Police and contrary to the District's vision and values, and he was encouraged to refrain from those behaviors. Aug. 25, 2017 Coaching Email, (Ex. 8); Wicks' Depo., 19:6–25, 20:11–22, 28:20–29:6, 30:10–20, 130:8–18, 147:24–149:12, 153:6–19 (Ex. 7); Aff. Of Wicks, ¶ 3 (Ex. 9); Meadors' Depo., 91:13–100:25 (Ex. 1).

6.      Wicks sent another coaching email to Meadors on September 11, 2017, about disrespecting other employees and insubordination. Specifically, Wicks recalled that on September 7, 2017, he and Meadors met with then-Chief Operations Officer Blaine Young ("Young"), during which Meadors again engaged in disrespectful and insubordinate conduct when he repeatedly interrupted Wicks and gestured to "shew" Wicks away while saying, "Yeah, that's what I thought." Wicks also noted that Meadors had loudly interrupted a Campus Police meeting to blame a coworker for some technical issues. Wicks then outlined his expectations that Meadors model behaviors of professionalism and respectfulness, support the District's core values (Equity, Character, Excellence, Team, and Joy), follow the chain of command, and refrain from behaviors reflecting "disrespectfulness, unprofessionalism, or insubordination." Sept. 11, 2017 Coaching Email, (Ex. 10); Aff. Of Wicks, ¶¶ 10–11 (Ex .9); Wicks' Depo., 19:6–25, 20:11–22, 28:20–29:6, 30:10–20, 130:8–18, 147:24–149:12, 153:6–19 (Ex. 7); Meadors' Depo., 91:13–100:25 (Ex. 1).

7.      On September 21, 2017, Meadors met with Young to discuss a disagreement between Meadors and one of Meadors' supervisors, Lieutenant Robert Jerome ("Jerome"), over Jerome assigning Meadors to traffic duty. After this meeting, Meadors called Jerome to say that Jerome was not his supervisor and could not assign him to any duty. Jerome informed Meadors that he was within Meadors' chain of command, but Meadors interrupted and restated that Jerome was not his supervisor, he would not do traffic duty, then said, "TAKE THAT!" and hung up.

Meadors described his relationship with Jerome as "adversarial". Sept. 21, 2017 Jerome Email, (Ex. 11); Wicks' Depo., 27:4–8; 76:10–17 (Ex. 7); Meadors' Depo., 102:1–103:7; 28:7–10 (Ex. 1).

8.     In September of 2017, Meadors covered a District security camera, at least twice, despite being sent an email directive by Swain on February 22, 2015, to not cover cameras. Feb. 22, 2015 Email Directive, ln. 8 and ¶ 2 (Ex. 12); Video of Meadors, (Ex 13); Meadors' Depo., 46:13–50:20 (Ex. 1); Meadors' Recorded Interview with Siegfried, *see* time stamp 00:11:30—00:12:45 (Ex. 14); Camera Invest. Rep., pp.1–4, "Keenan Meadors Interview" (Ex. 15). Meadors admits he had been previously directed by the District's Security Systems Manager, Sam Troglin, to not cover cameras. Feb. 22, 2015 Email Directive, ln. 8 and ¶ 2 (Ex. 12); Meadors' Depo., 48:23–50:14, 51:23–54:8 (Ex. 1). District officials believe that Meadors created a safety issue for students and employees by covering the camera. Wicks' Depo., 62:1–66:8 (Ex. 7); Robles' Depo., 58:7–18 (Ex. 16); Gist Depo., 117:10–12, 123:16–124:10, 23 (Ex. 17); Minutes of Nov. 13, 2017 Special Board Meeting & December 4, 2017 Regular Meeting, p.3 (Ex. 18).

9.     An investigation was conducted by Michelle Siegfried, District Lead for School & Workplace Investigations ("Siegfried"), who issued a report after interviewing witnesses and reviewing security camera footage, which showed Meadors climbing on top of a couch and covering a video camera while a female coworker sat nearby at a desk. Meadors admitted he covered the camera more than once despite being instructed not to do so, and he refused to cooperate further with the investigation, provide a written statement, or answer questions about his job duties without an attorney present. Camera Investigation Rep., pp.1–4, "Keenan Meadors Interview," BS# 1038 (Ex. 15); Wicks' Depo., 62:1–66:8 (Ex. 7); Robles' Depo., 58:7–18 (Ex. 16); Meadors' Depo., 48:23–50:14, 51:24–54:5 (Ex. 1); Aff. Of Siegfried, ¶¶ 3–6 (Ex. 19).

10. On September 27, 2017, Meadors was suspended with pay and full benefits pending an administrative hearing by committee on a recommendation for his termination that was conducted on October 16. Sept. 27, 2017 Suspension Ltr., (Ex. 2); Oct. 5, 2017 Notice of Termination Hearing. (Ex. 21); Oct. 16, 2017 Admin. Cmt. Findings, (Ex. 22); Meadors' Depo., 46:13–47:20, 54:9–56:6 (Ex. 1). On October 17, 2017, Meadors was notified the committee upheld the termination recommendation, and he was advised of his right to request a pre-termination hearing before the Board, which Meadors did request. Oct. 17, 2017 Admin. Hearing Rec. Ltr., (Ex. 23); Oct. 27, 2017 Pre-Termination Rts. Letter, (Ex. 24); Meadors' Depo., 58:1–17 (Ex. 1).

11. At Meadors' November 13, 2017 pre-termination due process hearing before the Board, he admitted to covering the cameras, and the Board determined his actions were misconduct, but decided to only demote him from Sergeant to Police Officer as a consequence. Meadors' Depo., 58:13–59:22, 63:1–65:1, 66:25–67:21 (Ex. 1); Minutes of November 13, 2017 Special Board Meeting & December 4, 2017 Regular Meeting, pp.3, 6 (Ex. 18).; Nov. 17, 2017 Adjustment Transmittal, (Ex. 25). Meadors admits he was given a fair hearing by the Board. Meadors' Depo., 66:22–24 (Ex. 1).

12. On November 26, 2017, Wicks received an email notification that Meadors had deleted an email Wicks sent on November 25 without reading it. The email was marked "<URGENT> School Support." Meadors does not deny he deleted school emails without reading them. Nov. 26, 2017 Deleted Email, (Ex. 26); Meadors' Depo., 167:14–20 (Ex. 1).

13. Wicks then drafted and provided Meadors a PDP around December 7, 2017, which memorialized that covering the cameras was insubordinate, reflected poor judgment and disobedience to a directive. It also outlined these expectations: 1) to have a positive and supportive attitude; 2) not be divisive, disrespectful, or undermining of leadership or coworkers; and 3) to have a positive, honorable, and unselfish attitude. The PDP warned that new incidents of

7

insubordinate, unprofessional, disrespectful, inappropriate, undermining, or unsafe behaviors may result in discipline. Meadors did not sign the PDP, and Wicks noted Meadors' refusal to sign the PDP on page 2 of that document. PDP, (Ex. 27); Aff. of Wicks, ¶¶ 10–11 (Ex. 9); Wicks' Depo., 19:12–23, 149:20–150:6, 153:3–156:20, 158:12–159:3 (Ex. 7); Gist Depo., 65:15–18 (Ex. 17); Meadors' Depo., 67:22–74:25 (Ex. 1).

14. In September 2018, Meadors failed to properly label, securely store, and log narcotics and drug paraphernalia. Wicks' Depo., 212:2–216:1; 216:16–21 (Ex. 7); Sept. 21, 2018 Emails between Billy Hobbs, Wicks, and Meadors, (Ex. 28); Meadors' Depo., 114:6–121:21 (Ex. 1). He claims this failure was due to his wife being on her deathbed, but she did not pass away until January 13, 2021. Meadors' Depo., 115:4–24, 9:5–17 (Exhibit 1).

15. On or around September 26, 2018, Meadors received an email request from principal Martin Vinyard to save a security video. Rather than assist, Meadors emailed Police Officer Christopher McFarland: "Please advise on my responsibility to provide a video to principal M. Vinyard." Sept. 16, 2018 Vinyard Email, (Ex.29); Meadors' Depo., 128:21–129:4, 130:6–133:11 (Ex. 1).

16. On February 6, 2019, Meadors was advised by one of his superiors, Major Virgil Green ("Green"), that he had no sick leave remaining. Meadors replied: "Major Green please advise me of your need to inform me of my sick time." Feb. 6, 2019 Green Email, (Ex. 30).

17. Certain Campus Police employees reported to Wicks that they felt Meadors had bullied them, which Wicks found disrupted the Campus Police team. Wicks' Depo., 133:21—134:2–7, 146:16–23, 149:20–24, 163:20–164:4, 193:1–13 (Ex. 7).

18. On April 15, 2019, Meadors arrested a student and stood by as the student's backpack was searched without a parent present. Green was very concerned with how Meadors conducted himself and emailed Robert Schornick, Instructional Leadership Director for the

8

District. Apr. 15, 2019 Email to Schornick, (Ex. 31); Meadors' Depo., 133:12–135:10 (Ex. 1).

19.     In April of 2019, Meadors transported a suspended student in his Campus Police vehicle at the request of a probation officer. This raised liability concerns for the District. When Green attempted to address it with Meadors, he argumentatively asserted that Green did not understand policies and procedures. April 3, 2019 Green, Harris, and Wicks Email, (Ex. 32); Meadors' Depo., 123:3–5 (Ex. 1); Wicks' Depo., 138:15–19 (Ex. 7); Robles' Depo., 22:7–23:5 (Ex. 16).

20.     On April 9, 2019, Green attempted to conduct a brief Campus Police vehicle inspection before school hours. Meadors took exception to Campus Police vehicles being parked in handicap spots during the inspection. Rather than respectfully discuss his concern with Green privately, Meadors took out his phone to take photos and/or videos and made disruptive statements about writing tickets to officers for parking in a handicap spot. In an email to Wicks, Green characterized the behavior as rude and unprofessional; it also delayed completion of the inspection. April 9, 2019 Inspection Email, (Ex. 33); Meadors' Depo., 121:22–128:20 (Ex. 1).

21.     In May of 2019, the District received a formal complaint from parents about Meadors inappropriately contacting their child at school, sending them a text message, and showing up unannounced to their home because Meadors wanted to solicit a letter of recommendation because he was "losing his job." The parents felt this was intimidating, Siegfried investigated, and Meadors was directed to cease all contact with the student and family. May 21, 2019 Green Email, (Ex. 34); Aff. of Siegfried, ¶ 8 (Ex. 19); Robles' Depo., 20:21—23:25 (Ex. 16); Gist's Depo., 117:10–12 (Ex. 17); Meadors' Depo., 137:16–143:13 (Ex. 1).

22.     Throughout the 2017–18 and 2018-19 school years, District leadership collected data and community feedback to improve service to its schools. It determined that modification of certain jobs/positions was necessary, including certain positions in Campus Police. In response,

9

Gist recommended the Reorganization to eliminate 179 positions, create 207 new jobs to absorb many of the former positions' functions, and add new responsibilities to those positions. Position eliminations were not based on employee performance. Like all affected employees, Meadors received a letter from Gist explaining her recommendation that his position (Police Officer) was one proposed for elimination, he had a right to a pre-termination hearing before the Board as to why his job should not be eliminated and how to request a hearing, and he and all other affected employees were encouraged to apply for vacant positions. Apr. 23, 2019 Recommendation, (Ex. 35); Apr. 23, 2019 Gist Ltr., ¶¶ 1–4 (Ex. 36); Apr. 23, 2019 Acknowledgement, p.1 (Ex. 37); Position Elimination Table, (Ex. 38); TPS Policy 4202 (Ex. 39); Gist Depo., 73:24–75:6, 106:25–107:15 (Ex. 17); Robles' Depo., 66:17–67:1 (Ex. 16); Meadors' Depo., 144:3–145:3, 150:1–25 (Ex. 1).

23.    In total, fifteen (15) Police Officer positions were recommended for elimination and replaced by newly-created School Safety Officer (SSO) positions, and 44 positions were eliminated from the Campus Police altogether. Position Elimination Table, p. 1 (Ex. 38); Superintendent's Board Presentation, BS # 920 (Ex. 40); Gist Depo., 46:20–48:11, 69:14–73:21 (Ex. 17); Meadors' Depo., 174:1–15 (Ex. 1).

24.    On May 13, 2019, Robles sent an email to Meadors and other Campus Police employees encouraging them to apply for newly-created positions and informing them how to find the new job descriptions on the District's website, how to apply, and about the interview process and required physical agility test. The email also said applicants could take the physical agility test before being conditionally recommended for hire. May 13, 2019 Robles Email, (Ex. 41); Meadors' Depo., 166:10–168:10, 169:10–170:4 (Ex. 1); Am. Compl., [Dkt. 30], ¶¶ 16, 19.

25.    Board Policy 4202 states that all professional and support staff positions are "created or deleted by the Board on recommendation from the Superintendent or designee . . . **An**

**increase in duties or an addition/change to a job description** as a basis for a recommendation for increased compensation **will be deemed a "new" position.**" (emphasis added). Meadors admits that Board Policy 4202 required the creation of a new position if there will be an increase in pay and that the SSO position is, in fact, paid at a higher rate than his former position of Police Officer. TPS Policy 4202, (Ex. 39) (emphasis added); Meadors' Depo., 175:15–176:2, 176:10–177:7 (Ex. 1); Robles' Depo., 80:14–20 (Ex. 16); Wicks' Depo., 229:3–6 (Ex. 7).

26.     The job description for Meadors' former position, "Police Officer," is less than one page in length, was created in May of 2012, and contained the responsibilities and essential functions of that position. 2012 Police Officer Job Description, (Ex. 42); Gist Depo., 46:25–48:11, 72:23– 73:13 (Ex. 17); Robles' Depo., 63:18–64:11 (Ex. 16). There are several major differences between the Police Officer job description and the SSO job description, which under Board Policy 4202 required the creation of a new position: (A) the SSO description is over four pages in length; (B) the Police Officer job description lists only two minimum qualifications, whereas the SSO job description has nine and adds new "Physical Requirements"; (C) the Police Officer job description lists only four "Responsibilities and Essential Functions," but the SSO job description lists 21; and (D) the police officer job description lists only three "Skills and Abilities Required," whereas the SSO job description lists 20. *Cf.* SSO Job Desc., (Ex. 43) *with* 2012 Police Officer Job Desc., (Ex. 42); TPS Policy 4202, (Ex. 39); Gist Depo., 46:19–48:11, 69:14–73:21 (Ex. 17); Robles' Depo., 63:8–64:11 (Ex. 16). Meadors admits that the Police Officer job description varies significantly from the SSO job description. Meadors' Depo., 177:8–178:13 (Ex. 1).

27.     Meadors was a member of the American Federation of Teachers Local 6049 ("AFT") bargaining unit. Meadors agrees that (1) the Collective Bargaining Agreement ("CBA") required the District to post new vacant positions, like SSO positions, and take applications before hiring; (2) the District must comply with the CBA; and (3) the SSO positions were vacant when

11

they were created, so they had to be posted and applications taken before anyone could be hired into the positions. CBA 18-19, p. 10(J), BS # 972 (Ex. 44); Meadors' Depo., 178:23–181:2 (Ex. 1). Board Policy 4101 also requires new positions be posted to the District's website for at least twenty (20) calendar days or as provided by negotiated agreement. TPS Policy 4101 (Ex. 45).

28.    Meadors believes that Gist orchestrated the 2019 Reorganization as a pretext to retaliate against him for his 2017 complaints of sexual harassment/misconduct against Wicks and Swain (on February 22, 2017) and signing the "Vote of No Confidence" against Wicks (on May 3, 2017). Meadors' Depo., 144:16–149:20 (Ex. 1); No Confidence Letter, (Ex. 6); Am. Compl., [Dkt. 30], ¶ 36.

29.    In April of 2019, Meadors requested a pre-termination hearing on the proposed elimination of his position and his nonreemployment, and the District provided him written notice of the date, time, and place of a due process hearing via certified mail. Apr. 25 & May 13 Hearing Req. and Conf., (Ex. 46); Meadors' Depo., 149:21–152:3 (Ex. 1). At a special board meeting on May 23, 2019, Meadors had a due process hearing. Meadors was represented by AFT President Ed McIntosh, opening statements were made, each side presented witnesses and introduced evidence, both Meadors and McIntosh cross-examined the Superintendent's witnesses, then closing statements were made by the Superintendent's representative and Meadors. The Board voted to approve the Superintendent's proposed Reorganization, including the elimination of 179 positions (109 of which were staffed at the time), including Meadors' position of Police Officer, and the nonreemployment of individuals employed in those positions effective June 30, 2019. The Board also voted to approve the creation of 207 new positions in various departments in the District, including the SSO positions. Meeting Minutes and Agenda, BS# 000881–884, BS# 001701–1702, 001718–1754 (Ex. 47); Wicks' Depo., 200:12–20 (Ex. 7); Termination Transmittal, (Ex. 48); Meadors' Depo., 207:11–14 (Ex. 1).

12

30.    Post-Reorganization, Meadors applied for a SSO (10-month) position and was interviewed by a panel comprised of Helen Lee, Dr. Oliver Wallace, Jamaal Dyer, and Green. He then interviewed with Robles. Each interviewer numerically rated Meadors on his responses to questions and hypothetical situations with a standard rubric, which had a 1-to-4 scale with 1 being the worst, 4 the best. Meadors' Depo., 168:3–13, 181:3–184:4 (Ex. 1); Panelist's Ratings, BS # 800 (Ex. 49); Panelist Rubric, (Ex. 50); Robles' Depo. 69:8–15, 139:2–7, 139:12–141:3, 146:2–4 (Ex. 16); Aff. of Lee, ¶¶ 3–6 and "Exhibit A" (Ex. 51); Aff. of Wallace, ¶¶ 2–5 and "Exhibit A" (Ex. 52). Meadors did not score well with the panelists or Robles, receiving overall scores of 2.5 and 2 respectively. Panelist Ratings, p. 4 (Ex. 49); Robles' Depo., 138:25–139:7, 139:12–142:25 (Ex. 16). Neither the interview panelists nor Robles asked Meadors about his age, discussed his age, or considered his age in rating his interview performance and/or suitability for the SSO position. Aff. of Lee, ¶ 8 (Ex. 51); Aff. of Wallace, ¶ 6 (Ex. 52); Robles' Depo., 67:2–5, 81:9–83:9, 146:2–147:8, 150:6–157:3, 151:21–152:22 (Ex. 16).

31.    A leadership team, which included Robles and Wicks, met and discussed applicants' interview ratings, past job performance of applicants, most-recent performance assessment and other relevant information. The team then recommended those applicants determined to be "good fits" for hire. Meadors' personnel file was not reviewed by the leadership team in making hiring decisions. The leadership team did not know, discuss, or consider Meadors' age. Dr. Gist did not make any final hiring decisions, nor did she give a directive not to hire Meadors. Robles' Depo., 69:4–71:17, 72:20–73:6, 74:8–76:7; 76:20–77:18, 83:10–16, 139:4–142:25 (Ex. 16); Wicks' Depo., 85:16–86:2, 86:13–92:11, 113:20–114:15; 114:23–115:23; 140:20–22; 227:12–14 (Ex. 7); Gist Depo., 120:13–14, 123:11–23, 151:5–8 (Ex. 17).

32.    Not all concerns or complaints about an employee's job performance result in formal disciplinary action or a record placed in an employee's personnel file, nor does Board policy

13

require such. The District does not confine its consideration of an employee's suitability for a new position based solely on official, formal documentation kept in a personnel file. In Meadors' case, the District considered its total experience with him as an employee when deciding whether to hire him for a SSO position, which included consideration of all relevant factors and incidents, including those not formally documented and those for which he was not "disciplined." Gist Depo., 50:8–11, 117:1–13, 120:13–121:6; 123:12–2 (Ex. 17); Robles' Depo., 24:1–7, 24:25–25:1, 69:23–70:17, 71:12–17, 75:5, 150:6–151:3, 159:19–160:5 (Ex. 16); Wicks' Depo., 113:20–115:23, 206:5–209:23, 133:17–23, 221:15–222:7, 222:16–223:12 (Ex. 7); Aff. of Wicks, ¶¶ 2–5, 9 (Ex. 9).

33.    Though Meadors had years of police experience and, at times, performed well and had some positive relationships with coworkers, the leadership team ultimately did not recommend Meadors for a SSO position based on a number of factors which it felt indicated that he was not a "good fit" and could not work productively under Wicks as his supervisor. Among these factors were his poor interview performance and history of (1) insubordination; (2) disobedience to the security camera directive in 2017, which the District believed created both safety and liability concerns; (3) divisiveness; (4) disruption to the TPSPD team; (5) behaviors that were contrary to the District's vision and values;  (6) disrupting a routine vehicle inspection; (7) disregard for the chain of command; (8) the disrespectful and argumentative way he spoke to his supervisors—including Wicks, Green, and Jerome; (9) undermining Wicks in Campus Police; (10) raising his voice to superior officers and supervisors; (11) disrespectful comments to or about coworkers; (12) occasional unwillingness to assist other District personnel and supervisors; (13) resistance to "coaching" to grow as a professional and to cease unprofessional and disruptive behaviors; (14) reports of him bullying of coworkers; (15) a formal parent complaint that Meadors sent them text messages and came to their home unannounced and stopped their child at school to solicit a letter of recommendation because his job was being eliminated by the Reorganization—which

14

intimidated the family; and (16) improperly labeling, storing and logging drug evidence. PDP, (Ex. 27); Wicks' Depo., 113:20–114:15, 115:1–23, 123:12–19, 133:4–134:7, 143:17–20, 144:6–17, 146:20–148:4, 148:23–149:6, 149:20–24, 152:2–152:12, 192:20–193:13, 210:10–211:10 (Ex. 7); August 25, 2017 Coaching Email, (Ex. 8); Sept. 11, 2017 Email, (Ex. 10); Aff. of Wicks, ¶¶ 2–8, 10–12 (Ex. 9); Gist Depo., 97:15–25, 113:6–114:3, 117:5–12, 120:13–121:6, 122:21–124:25 (ex. 17); Aff. of Siegfried, ¶ 8 (Ex. 19); Robles' Depo., 20:1–23:25, 43:23–44:10, 85:7–89:14 (Ex. 16); May 21, 2019 Green Email, (Ex. 34); Meadors' Depo., 137:19–143:13 (Ex. 1).

34.     Wicks, Robles, and Gist did not visit the Office of Talent Management to review Meadors' official personnel file, but they have seen records related to Meadors' job performance, independent of Meadors' official personnel file. Wicks' Depo., 222:16–223:12 (Ex. 7); Robles' Depo., 24:1–7, 71:12–17, 75:5 (Ex. 16); Gist Depo., 5:12–16; 49:12–15; 51:19–52:1 (Ex. 17).

35.     When Meadors was not selected for a SSO position, he contacted Carlos Lopez, then-Director of Talent Strategy ("Lopez"), to ask why. It is the District's practice to not provide rejected job applicants specific reasons for not hiring them, so Lopez explained that the District's decision "included a review of [Meadors'] past job evaluations, job skills, and qualifications to perform the work of the new roll"—all boilerplate language from the CBA. June 18, 2019 Naftzger Ltr., (Ex. 53) Meadors' Depo., 187:1–189:13 (Ex. 1); June 27, 2019 Lopez Ltr., (Ex. 54); CBA 18-19, p. 10(J), BS # 972 (Ex. 44).

36.     Not only was age not considered by the Leadership Team in filing SSO's, it is undisputed that age was certainly not *the* factor in the District's decisions to (1) eliminate Meadors' position and (2) not hire him for a SSO position. **Meadors repeatedly admitted this fact**:

> Q: "You think that the district did not hire you for the position of [SSO] because of your age, is that right?
> A: "I think that my losing of my job, that was part of that, **not the rehiring**."

Q: "[I]f you had evidence that showed that your age was *the* factor that made the difference in the decision not to hire you for [SSO], you would identify that evidence right now, is that correct?"
A: **"It was not *the* factor."**
Q: "It was not *the* factor?"
A: **"*The* factor was the dilution of my due process** to save my job by giving me a dual responsibility that I was not prepared to do, which no information was given me so I could prepare."

Q: "Do you have any evidence that your age was *the* factor that resulted in the decision not to hire you?
A: "[F]or about the third time, **it was not *the* factor**. . . I just don't know how many times you want me to say it . . . **It was not *the* factor."**

Meadors' Depo., 209:2–210:14, 210:20–25, 211:5–12, 211:22–212:5, 213:5–13 (Ex. 1) (italics in original, emphasis added); Wicks' Depo., 137:17–138:3, 140:20–141:1 (Ex. 7.); Robles' Depo., 82:10–12, 82:15–83:9 (Ex. 16); Aff. of Lee, ¶ 8 (Ex. 51); Aff. of Wallace, ¶ 8 (Ex. 52).

37.    Meadors filed an EEOC Complaint on February 7, 2020, alleging retaliation for reporting sexual harassment/misconduct, retaliation for rejecting Dr. Gist's "embrace," and age discrimination for the District's failing to hire him as an SSO. Am. Compl. [Dkt. 30], Ex. A. On August 27, 2020, the EEOC closed its file, unable to conclude violations of the statutes occurred. Am. Compl. [Dkt. 30], Ex. B. Meadors filed an *Amended Complaint* [Dkt. 30] in this matter, alleging the following causes of action: (1) age discrimination (2) retaliation for complaining of sexual harassment under Title VII, (3) denial of due process, and (4) breach of fiduciary duty under the Employee Retirement Income Security Act ("ERISA").

16

## ARGUMENTS AND AUTHORITIES

### Summary Judgment Standard

Pursuant to Rule 56, FED. R. CIV. P., a motion for summary judgment should be granted if the record demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The United States Supreme Court has defined the standards by which a motion for summary judgment is to be judged. In *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the Court stated:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.* at 322. The Court observed:

> One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose.

*Id.* at 323-24.

On the same day that *Celotex* was decided the Court also decided *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), in which the Court held that the standard for motions for summary judgment is the same as the standard for directed verdicts. *Id.* at 250. As the Court previously stressed in *Matsushita Electric Industries, Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.*, at 586-87 (citations omitted). Thus, a properly supported motion for summary judgment should be granted unless there is sufficient evidence in the record to justify a jury verdict for the non-moving party.

17

The Tenth Circuit has discussed the analysis called for by Rule 56 as follows:

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law" .... Factual disputes about immaterial matters are irrelevant to a summary judgment determination .... We view the evidence in a light most favorable to the nonmovant; however, it is not enough that the nonmovant's evidence be "merely colorable" or anything short of "significantly probative."

\*     \*     \*

A movant is not required to provide evidence negating an opponent's claim .... Rather, the burden is on the nonmovant who "must present affirmative evidence in order to defeat a properly supported motion for summary judgment .... After the nonmovant has had a full opportunity to conduct discovery, this burden falls on the nonmovant even though the evidence probably is in the possession of the movant (citations omitted).

*Committee for the First Amendment v Campbell*, 962 F.2d 1517, 1521 (10th Cir. 1992).

Thus, in order to defeat the School District's motion for summary judgment, Meadors must now come forward with "affirmative evidence" that is "significantly probative" of his claim. He cannot rely on that which is "merely colorable" to defeat this motion for summary judgment. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## PROPOSITION I

### Meadors Cannot Recover for Alleged Title VII Violations from 2017

While he did not plead it, Meadors testified that he is asserting a claim that the District suspended and demoted him in November 2017, in part, due to his reporting of sexual harassment/misconduct in 2017, a discrete act of alleged retaliation which is time barred by 42 U.S.C. § 2000e-5(e)(1). Undisputed Facts 3 & 37; Am. Compl., [Dkt. 30], ¶¶ 23, 32. Meadors was required to exhaust his administrative remedies for each of his claims in a charge before the EEOC as a condition precedent to filing suit. *See Gad v. Kansas State. Univ.*, 787 F.3d 1032, 1040 (10th

18

Cir. 2015) (discussing whether question of exhaustion is jurisdictional and "[h]olding [a specific exhaustion requirement to be] non-jurisdictional does not imply any diminution in the need for plaintiffs to comply with [the exhaustion] requirement," and a defendant "may still achieve the dismissal of a plaintiff's suit" based upon the failure to so comply).

This claim should fail for failure to assert it in the Amended Complaint [Dkt. 30]. Further, filing a charge of discrimination within 300 days after the allegedly unlawful practice occurs "is a prerequisite to the filing of a civil suit under Title VII[,] and a claim is time barred if not filed within these time limits." *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1183 (10th Cir. 2003). Though the EEOC charge filing requirement is not jurisdictional, it may be raised as an affirmative defense. *Johnson v. Spirit Aerosystems, Inc.*, 20-CV-00138-GKF-CDL, 2022 WL 1174120, at *5 (N.D. Okla. Mar. 24, 2022), appeal dismissed, *Johnson v. Spirit Aerosystems, Inc.*, 22-5028, 2022 WL 13631886 (10th Cir. Aug. 12, 2022) (citing *Ft. Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1850-51 (2019); *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185 (10th Cir. 2018)). As the Tenth Circuit explained, "a plaintiff can bring a lawsuit only for those 'unlawful employment practices' described in his or her administrative charge." *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1166 (10th Cir 2007); *see also Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (noting that each discrete incident of allegedly discriminatory treatment constitutes its own "unlawful employment practice' for which administrative remedies must be exhausted").

Meadors filed his EEOC Charge of Discrimination on February 7, 2020. Undisputed Fact 37. In his deposition, Meadors testified that he is asserting his 2017 suspension and demotion were retaliation for raising sexual harassment/misconduct complaints on February 22, 2017. Undisputed Fact 3. Meadors was suspended and recommended for termination on October 5, 2017, but was instead demoted by the Board on November 13, 2017—**816 calendar days before he filed his Charge of Discrimination in 2020**. Undisputed Fact 11. Meadors did not file an EEOC claim

19

regarding his 2017 demotion within the 300-day window; instead, he waited until February 7, 2020, so his claims related to the 2017 complaints are time barred.

Nor can Meadors invoke the "continuing violation" doctrine to save those claims. As discussed in *National Railroad Passenger Corporation v. Morgan*, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts allegedly in timely filed charges." 536 U.S. 101, 113 (2002). "Because each discrete discriminatory act starts a 'new clock,' a separate charge must be filed within the applicable period," which Meadors did not do. *Palzer v. Coxcom, LLC*, 15-CV-00564-GKF-JFJ, 2019 WL 11585348, at *7 (N.D. Okla. Sept. 17, 2019), aff'd, *Palzer v. CoxCom*, LLC, 833 Fed. Appx. 192 (10th Cir. 2020) (citing *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (noting that "*Morgan* abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted.").

Therefore, Meadors' purported Title VII retaliation claims (that he did not plead) regarding his 2017 suspension and demotion are time barred and utterly fail as a matter of law.

## PROPOSITION II

### The District is Entitled to Judgment as a
### Matter of Law on Meadors' Age Discrimination Claim

Meadors claims that the District discriminated against him in violation of the ADEA when it declined to hire him as a SSO purportedly on the basis of his age. Am. Compl. ¶¶ 28–30 [Dkt. 30]. The undisputed facts demonstrate that Meadors' age was not considered by the District in making the decision to not hire him. Further, Meadors admits that age was not **the** factor that made the difference in the decision not to hire him. Indeed, the District had at least sixteen (16)

20

legitimate, non-discriminatory reasons for its decision, and Meadors cannot show that those reasons are merely a pretext for discrimination. Meadors' ADEA claim fails as a matter of law.

### a.    Meadors Admits that Age Was Not <u>the</u> Reason He Was Not Hired

The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). "[T]he ordinary meaning of the ADEA's requirement that an employer took adverse action **'because of age'** is that age was **the 'reason'** that the employer decided to act." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 178 (2009) (citations omitted) (emphasis added). Hence, the burden of persuasion under the ADEA is that the plaintiff must prove by a preponderance of direct or circumstantial evidence that age was the "but-for" cause of the challenged employer decision. *Id.* at 178 (citations omitted).

In the Tenth Circuit, this causal standard does not require a showing that age was the sole motivating factor in an employer's challenged decision; other factors may have contributed to the employer taking adverse action, **so long as "age was *the* factor that made a difference**." *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1277–78 (10th Cir. 2010) (citing *Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010) and *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)) (emphasis added). Thus, if Meadors cannot prove by a preponderance of the evidence that age was "**the** factor that made a difference" (i.e., the "but-for cause"), then the District is entitled to judgment as a matter of law.

The District maintains that age was never considered in deciding to not hire Meadors as a SSO, and it is undisputed—in fact, **Meadors admits**—that **age was not *the* factor** that made a difference in the District's decision not to hire him. <u>Undisputed Facts 30, 33, 36</u>. Accordingly,

Meadors cannot prove that age was the "but-for cause" of the decision to not hire him, and the District is entitled to judgment as a matter of law on Meadors' ADEA claim.

### b.    The *Prima Facie* Case

Meadors has no direct evidence that the District declined to hire him as a SSO because of his age. When no direct evidence of discrimination is present, a plaintiff's discrimination claim must be analyzed under the burden-shifting framework as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1079-80 (10th Cir. 1999). To establish an ADEA prima facie case in the failure-to-hire context, a plaintiff must demonstrate that (1) he was within the protected age group; (2) he was qualified for the position sought; (3) he was adversely affected by an employment decision of the defendant; and (4) a younger person was hired. *Corneveaux v. Cuna Mut. Ins. Group*, 76 F.3d 1498, 1502 (10th Cir. 1996).

### c.    Legitimate, Nondiscriminatory Reasons and Pretext Analysis

Under *McDonnell Douglas* and *Burdine*, if a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to show a "legitimate, nondiscriminatory reason" for its action. As soon as the defendant offers evidence of a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination "simply drops out of the picture." *Jones v. Unisys Corp.*, 54 F.3d 624, 630 (10th Cir. 1995) (internal citations omitted). "To satisfy this burden, 'the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.'" *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999) (internal citations omitted).

"If the employer comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff to show that 'there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual – i.e., unworthy of belief.'"

22

*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (internal citations omitted). This burden then merges with the plaintiff's ultimate burden of persuading the court that he has been the victim of intentional discrimination. *Rea v. Martin Marietta Corporation*, 29 F.3d 1450, 1455 (10th Cir. 1994). "[E]ven though a plaintiff has established a prima facie case, the defendant is entitled to summary judgment unless the plaintiff produces either direct evidence of discrimination or evidence that the defendant's proffered reason for the action taken was pretextual." *Selenke*, 248 F.3d at 1260 (citing *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1396 (10th Cir. 1997)).

Assuming, *arguendo*, that Meadors can establish a prima facie case, the District had at least sixteen legitimate, nondiscriminatory reasons to not hire him as a SSO: (1) insubordination (Undisputed Facts 5–7, 12–13, 16, 19–20, 33); (2) disobedience to the security camera directive in 2017, which created safety and liability concerns (Undisputed Facts 8–9, 11–12, 32–33); (3) divisiveness (Undisputed Facts 5–6, 13, 33); (4) disrupting the Campus Police team (Undisputed Facts 5–6, 13, 17, 33); (5) behaviors that were contrary to the District's vision and values (Undisputed Fact 5 & 33); (6) disrupting a routine vehicle inspection (Undisputed Facts 20 & 33); (7) disregard for the chain of command (Undisputed Facts 6–7, 33); (8) the disrespectful and argumentative way he spoke to some of his supervisors—including Wicks, Green, and Jerome (Undisputed Facts 5–7, 13, 16, 33); (9) voicing negative comments about his supervisor, Wicks (Undisputed Facts 5–6, 33); (10) raising his voice to superior officers and supervisors (Undisputed Facts 5–7, 33); (11) disrespectful comments to and/or about coworkers (Undisputed Facts 5–6, 33); (12) occasional unwillingness to assist or cooperate with other District personnel and supervisors (Undisputed Facts 15, 33); (13) resistance to "coaching" to grow as a professional and to cease unprofessional and disruptive behaviors (Undisputed Facts 5–6, 33); (14) reports of his occasional bullying of coworkers (Undisputed Facts 4, 17, 33); (15) a formal parent complaint that Meadors intimidated them and their child when he came to their home unannounced and stopped

23

the child at school so that Meadors could solicit a letter of recommendation from them (Undisputed Facts 21, 33); and (16) Meadors improperly labeling, storing and logging drug evidence (Undisputed Facts 14, 33).

Meadors has no evidence that the District's legitimate non-discriminatory reasons are pretextual. He cannot establish pretext by simply disputing the District's assessment or perception of his past job performance and conduct. The issue is not whether the District's assessment and perception of Meadors as an employee was accurate; rather, it is whether the District's proffered legitimate non-discriminatory reasons were the true reasons it did not hire him as a SSO. This point is illustrated by the Tenth Circuit's analysis in *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076 (10th Cir. 1999). There, the plaintiff claimed he was terminated because of his age and heart condition, while the employer contended that the plaintiff was terminated because he engaged in sexual harassment. The court explained as follows:

> We emphasize that the relevant inquiry is not whether Mr. Hardy intended to engage in sexual harassment . . . [r]ather, it is **whether S.F. Phosphates *perceived* Mr. Hardy's behavior as gender-based harassment**, or simply used the rationale as a pretext for illegal discrimination because of Mr. Hardy's age or his heart condition. *See Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997) (noting that the "pertinent question" in determining pretext is not whether the employer was right to think that the employee engaged in misconduct, but **whether that belief was genuine or pretextual**).

*Hardy*, 185 F.3d at 1080 (emphasis added). In *Hardy*, the Tenth Circuit affirmed the granting of summary judgment to the defendant, remembering that its role was not "to act as a super personnel department that second guesses employers' business judgments" and that "[i]t was not [the Court's] province to decide whether [the defendant's proffered] reason was wise, fair, or even correct, ultimately, **so long as it truly was the reason" for the plaintiff's actions**. *Id.* at 1083 (internal citations and quotations omitted) (emphasis added).

24

To avoid summary judgment, Meadors must now present evidence that the above-listed reasons for the District's decision to not hire him as a SSO were simply a pretext to discriminate against him on the basis of his age. Meadors' mere subjective belief, without more, is not sufficient to withstand this motion. *Kendrick v. Penske Transportation Services*, 220 F.3d 1220, 1231, n.11 (10th Cir. 2000) (citing *Aramburu v. The Boeing Company*, 112 F.3d 1398, 1408 n.7 (10th Cir. 1997). Moreover, the Tenth Circuit has repeatedly held that conclusory allegations, standing alone, cannot withstand a motion for summary judgment. *Morgan v. Hilti, Inc.*, 108 F.3d at 1324. "[C]onclusory allegations are insufficient to defeat [the defendant's] adequately supported motion." *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995).

Meadors apparently believes his qualifications and experience as a police officer mean that no reasonable employer could refuse to hire him, so he assumes that the District's decision to not employ him as a SSO was based on his age. Am. Compl. [Dkt. 30], ¶¶ 20, 28; Meadors' Depo., 217:2–10 (Ex. 1). However, as the court in *Romig v. City of Iola* found, Meadors cannot rely upon his experience in the area of law enforcement as a basis to establish that all of the District's proffered reasons for its actions are pretextual for discrimination. 34 F. Supp. 2d. 1265 (D. Kan. 1998).

In *Romig*, a police officer applicant was not hired by the City of Iola, and he claimed age discrimination under the ADEA. *Id.* at 1265. The plaintiff, a former police chief, had extensive law enforcement experience and education and made numerous applications with Iola's police department to be either a patrolman or dispatcher. Each time, he was not selected for hire, and a younger person was hired instead. Iola's Chief of Police interviewed many of Romig's former supervisors, coworkers, and references, and learned that many thought Romig was difficult to get along with, unprofessional, or had a poor attitude. *Id.* at 1267–68. From this, the Chief concluded that Romig would not work effectively with others in the department or chain of command, and he might be disruptive. As a result, the City of Iola never hired him. *Id.* at 1268.

25

In an effort to prove Iola's reasons for not hiring him were pretextual, Romig highlighted his significant experience in law enforcement and education, which he believed rendered him the most-qualified candidate. *Id.* at 1272. However, Iola never claimed he was not the most-experienced candidate, only that it perceived him as unable to work well with others and function effectively in the department—a reason "wholly unrelated to plaintiff's experience or education." *Id.* at 1273. The court went on to explain as follows:

> **[T]he mere fact that plaintiff was the most experienced applicant in terms of law enforcement work does not demonstrate that the City's proffered reason for failing to hire him was pretextual or unworthy of credence. In other words, plaintiff's experience would be relevant to the pretext analysis <u>only if</u> the City had relied on plaintiff's experience as a basis for failing to hire plaintiff. The City has not suggested that plaintiff's experience factored into its employment decision. Thus, the court disregards plaintiff's efforts to refute the City's nondiscriminatory reason with facts relating to his superior experience in the law enforcement field.** *Id.* at 1273-74 (emphasis added).

Romig also argued that Iola had not followed its internal procedures when it conducted a review of his references, calling it "cursory at best." *Id.* However, even if Iola's background check was cursory, "'such evidence goes only to process and not to purpose or motivation, and could not provide a sufficient basis for a jury to find pretext for age discrimination.'" *Id.* (quoting *Ingles v. Thiokol Corp.*, 42 F.3d 616 (10th Cir. 1994)).

Here, like *Romig*, Meadors can bring forth only conclusory allegations based on his subjective opinion that he was so well-qualified and experienced that his age must have been "the reason" he was not hired as a SSO. The District respectfully submits that this Court should find, as the *Romig* court did, that Meadors' experience in law enforcement is irrelevant to the pretext analysis and disregard it. Because Meadors is unable to bring forth sufficient evidence to overcome the District's legitimate, non-discriminatory reasons for not hiring him as a SSO, Meadors claim of age discrimination claim fails as a matter of law, and summary judgment should be granted to the District.

## PROPOSITION III

### The District is Entitled to Judgment as a
### Matter of Law on Meadors' Title VII Retaliation Claim

Because there is also no direct evidence of retaliation, Meadors' Title VII retaliation claim is also governed by the *McDonald Douglas* framework. Therefore, he must first establish a prima facie case of retaliation: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006), *citing Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). If the plaintiff can satisfy his prima facie case, then the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for the adverse action. If the employer meets that burden, it then shifts back to the plaintiff to show that the proffered explanation is a pretext for retaliation. *Id.* at 1202-03.

### A.      Meadors Cannot Establish a Prima Facie Case of Retaliation

Meadors contends that the District eliminated his position and declined to hire him as an SSO, in part, because he reported alleged sexual harassment and misconduct. Am. Compl., ¶ 32 [Dkt. 30]; Undisputed Facts 3 & 37; Meadors' Depo., 64:15–66:24, 144:24–146:7, 196:24–197:8, 198:19–22, 209:7–20 (Exhibit 1). Nothing could be further from the truth.

#### 1.      *Protected Activity and Adverse Action*

For purposes of summary judgment, the District does not dispute that Meadors engaged in protected activity under Title VII when he reported his belief that Wicks and Swain engaged in sexual harassment and/or misconduct to District officials, Undisputed Facts 3 & 37, nor does it deny that a reasonable employee would find having his position eliminated and not being hired for a new position would be adverse. It does, however, deny that Meadors reporting this misconduct

27

had any bearing on its decisions to eliminate his position of Police Officer and not hire him as a SSO in 2019. Meadors cannot bring forth any evidence to prove it did, other than speculation and conjecture, which cannot withstand a motion for summary judgment. *Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017).

### 2.    *Causal Connection*

Under Tenth Circuit precedent, the requisite causal connection between an adverse employment decision and the protected activity may be shown by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct **closely followed** by adverse action." *O'Neal*, 237 F.3d at 1253 (quoting *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir.1982)) (internal quotation marks omitted, emphasis added). Where "very close temporal proximity between the protected activity and the retaliatory conduct" is lacking, "the plaintiff must offer additional evidence to establish causation." *Id.* The Tenth Circuit has held that a **three-month** gap, standing alone, is **insufficient** to establish a sufficient nexus in retaliation claims. *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (emphasis added).

While it is preposterous to expect this Court to believe that the District would eliminate 179 positions and subject many employees to the specter of unemployment solely to retaliate against *one* person—that is precisely what Meadors said in his deposition. The claim is made even more farcical when it is considered alongside the District's sixteen legitimate, non-discriminatory reasons to not hire him as a SSO. But what is most fatal to Meadors' theory of retaliation is the **816-day interval** between his reporting of Wicks' and Swain's misconduct and the elimination of his position and decision to not hire him as a SSO—more than seven times the too-attenuated gap in *Richmond*. Undisputed Facts 3, 11 & 37. Because Meadors' protected activity and the elimination of his position and non-hiring are far too attenuated in time, he cannot establish the requisite nexus, so his retaliation claim also fails as a matter of law.

28

## PROPOSITION IV

### The District Provided Meadors All Required Due Process Protections and Rights when His Position Was Eliminated; He Had No Property Interest in New Employment

When examining claims brought under the Fourteenth Amendment, "[t]he U.S. Supreme Court has "interpreted this language as guaranteeing not only certain procedures when a deprivation of an enumerated right takes place (procedural due process), but also as guaranteeing certain deprivations will not take place without a sufficient justification (substantive due process). *Browder v. City of Albuquerque*, 787 F.3d 1076, 1078 (10th Cir. 2015).

In his Amended Complaint [Dkt. 30], ¶¶ 33–38, Meadors alleges a generalized due process violation that the District "did not afford Plaintiff due process when it failed to rehire him." Though not pleaded, Meadors also asserted in his deposition that this claim now included his contention that his due process rights were "diluted" when he was not provided sufficient information about the Reorganization to effectively argue against it. Meadors' Depo., 212:6–213:2 (Ex. 1). Meadors cites no case law or statutory authority under which he has brought these accusations; regardless, the undisputed facts demonstrate that the District afforded Meadors the full panoply of due process required under federal and state law when it eliminated his position; he had no due process rights in connection with the SSO hiring decision.

### A.    *Procedural Due Process*

"The requirements of procedural due process apply only to the deprivation of those liberty and property interests encompassed by the Fifth and Fourteenth Amendments." *Coleman v. Darden*, 595 F.2d 533, 537 (10th Cir.), cert. denied, 444 U.S. 927 (1979). The Tenth Circuit has made this much clear: "**There is no constitutionally protected right to government employment.**" *Coleman v. Darden*, 595 F.2d 533, 538 (10th Cir.), cert. denied, 444 U.S. 927 (1979). To state an actionable procedural due process claim, a plaintiff must allege "(1) the

29

deprivation of a liberty or property interest and (2) **that no due process of law was afforded**." *Ripley v. Wyo. Med. Ctr., Inc.*, 559 F.3d 1119, 1122 (10th Cir. 2009) (internal quotations omitted, emphasis added). Property interests are created by state law. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). In the employment context, a property interest is "a legitimate expectation in continued employment." *Lenz v. Dewey*, 64 F.3d 547, 551 (10th Cir. 1995) (citing *Roth*, 408 U.S. at 577). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it," but rather "must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756, (2005) (quoting *Roth*, 408 U.S. at 577) (internal quotations omitted).

Here, it is undisputed that the Plaintiff had a protected property interest **in *continued employment*** when his position was eliminated pursuant to the Reorganization by virtue of the procedural rights set forth in the Constitution and OKLA. STAT. tit. 70, §§ 6-101.40 - 6-101.47. Those rights were fully afforded to Meadors because the District complied with statutory procedures when it eliminated his position, even if he does not believe that was sufficient, or he felt somehow disadvantaged. Undisputed Facts 10–11, 22, 29.

"**A full evidentiary hearing is not required** prior to an adverse employment action" in order to satisfy pre-deprivation due process obligations owed to government employees. *Riggins v. Goodman*, 572 F.3d 1101, 1109 (10th Cir. 2009) (citing *West v. Grand Cnty.*, 967 F.2d 362, 367 (10th Cir. 1992) (emphasis added). Instead, the employee "**needs only to be given notice and an opportunity to respond**." *Id.* (emphasis added). Such a hearing only requires: (1) "oral or written notice [to the employee] of the charges against him," (2) "an explanation of the employer's evidence," and (3) "an opportunity [for the employee] to present his side of the story." *Montgomery v. City of Ardmore*, 365 F.3d 926, 936 (10th Cir. 2004) (citing *Cleveland Bd of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). **Nothing more is required**.

Here, it is undisputed that the Plaintiff was given advance written notice of the 2019 Reorganization and the proposed elimination of his position and the reasons for it. It is undisputed that he received advance notice in the form of a letter from Gist and a copy of her recommendation to the Board. That letter outlined 1) she was recommending a Reorganization, 2) the reasons for the proposed Reorganization, 3) that it would result in the elimination of many jobs District-wide, including Meadors' job as Police Officer, 4) that the final decision rested with the Board, 5) that Meadors had a right to a pretermination hearing before the Board to contest the elimination of his position, and 6) how to request that hearing. Undisputed Facts 22–23, 29. It is undisputed that Meadors received this letter, that he requested a pre-termination hearing before the Board, and that he was informed by separate letter of the date, time, and place of the hearing, along with the following statement:

> At that time the Board will hear evidence and determine whether your position should be eliminated and whether you should be non-reemployed from your position with the School District. Undisputed Facts 22-23, 29.

It is further undisputed that Meadors was present at that Board meeting and participated in his pre-termination hearing; he was represented by his union representative, McIntosh; he testified; presented evidence; cross examined witnesses; and made a closing statement. Undisputed Fact 29. Nothing more is required by federal or state law. *Riggins*, 572 F.3d at 1109; *Montgomery*, 365 F.3d at 936; *Seibert v. Univ. of Okla. Health Sciences Center*, 867 F.2d 591, 596-99 (10th Cir. 1989); OKLA. STAT. tit. 70, § 6-101.40 *et seq*. The undisputed material facts conclusively establish that Meadors was afforded the full panoply of procedural due process rights before his position was eliminated by the Reorganization.

### B.   Substantive Due Process

If and to the extent Meadors is found to have made a substantive due process deprivation claim based on the elimination of his position, that claim also fails as a matter of law because

31

"[t]he Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop v. Wood*, 426 U.S. 341, 350, (1976). Instead, "[s]ubstantive due process requires only that termination of that interest not be arbitrary, capricious, or without a rational basis." *Brenna v. Southern Colo. State College*, 589 F.2d 475, 477 (10th Cir. 1978) (internal citations omitted); *Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1215 (10th Cir. 1998). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (internal quotations omitted).

The undisputed facts demonstrate that both Gist and the Board **carefully articulated the rationally-based reasons** for the Reorganization (e.g., new vision, job duty change, higher pay), and because the new position of SSO resulted in an entirely new job description, duties and increased pay, the District followed its own internal procedures and policies, particularly TPS Policy 4202, which requires the elimination of a position and the creation of a new one when there is a change in job duties *or* an increase in pay—both were the case regarding the new SSO position for 2019. As the minutes from that meeting demonstrate, there was nothing arbitrary or capricious in the Board's decision to eliminate Meadors' position, and, as such, he has no valid substantive due process claim in that regard either. Undisputed Facts 22, 24–27, 29.

### C.      The Board's Actions Do Not Shock the Conscience.

Moreover, to the extent Meadors claims he had a property interest in continued employment or new employment with the District, Meadors must show that the conduct of the District in its decisions to eliminate his position and declining to hire him would "shock the conscience of federal judges" to prevail. *Collins v. Harker Heights*, 503 U.S. 115, 126 (1992). To do this, he must "do more than show that the government actor caused injury to [him] by abusing or misusing government power." *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995). Instead, he

32

"must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995). Whether conduct shocks the conscience is a question of law. *See Perez v. Unified Gov't of Wyandotte Cnty./Kan. City, Kan.*, 432 F.3d 1163, 1168 n.4 (10th Cir. 2005). A high level of outrageousness is required to meet this standard. 64 F.3d at 675.

Here, Meadors cannot possibly show that the Board was without a rational basis when it considered and approved the Reorganization, nor that its decision was "so arbitrary it [would be found to] shock[] the judicial conscience[.]" *Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019). Undisputed Fact 29.

### D.    *Meadors Had No Protected Interest in New Employment.*

To the extent Meadors asserts a due process claim based on not being hired after the Reorganization, that argument also fails as a matter of law because a due process claim requires the deprivation of a protected property interest, and Meadors had no protected property interest in being hired for a new position because "[t]here is no constitutionally-protected right to government employment." *Coleman v. Darden*, 595 F.2d 533, 538 (10th Cir.), cert. denied, 444 U.S. 927 (1979). At best Meadors' "right" was a "unilateral expectation" or an "abstract need or desire," which do not rise to the level of a fundamental right. *See Coleman v. Darden*, 595 F.2d 533, 537 (10th Cir.), cert. denied, 444 U.S. 927 (1979). Because Meadors' lacked a property interest in new employment, his due process claim for failure to hire him as a SSO fails as a matter of law.

### PROPOSITION V

**Meadors' Claim for Breach of Fiduciary Duty under ERISA Fails as a Matter of Law Because Governmental Employee Benefit Plans Are Exempt under ERISA**

Meadors' employee benefit plan through the District was a "governmental plan" under ERISA, so his breach of fiduciary duty claim under ERISA fails as a matter of law. 29 U.S.C. §

1001 *et seq*. Title I of ERISA "governs the Protection of Employee Benefit Rights." However, an employee benefit plan is exempt from the provisions of ERISA if it qualifies as a "governmental plan" as defined under ERISA. *Id.* at § 1003(b); *Graham v. Hartford Life & Accident Ins. Co.*, 589 F.3d 1345, 1353 (10th Cir. 2009). In relevant part, 29 U.S.C. § 1002(3)(32), defines "governmental plan" as "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." *Graham v. Hartford Life & Accident Ins. Co.*, 589 F.3d 1345, 1353 (10th Cir. 2009). When determining if the "government plan" exemption applies to an employer's benefit plan, the Tenth Circuit looks to whether the plan was "established or maintained" by a "public entity." *Id.*

It is undisputed that Meadors enrolled in the Oklahoma Teachers' Retirement System ("OTRS") and HealthChoice health insurance. Undisputed Fact 2. Both OTRS and HealthChoice are governmental plans under ERISA, as they are each established and maintained, by a public entity, the State of Oklahoma. OKLA. STAT. tit. 74, §§ 1301–1328; 2003 OK AG 15, ¶ 2; 1987 OK AG 144, ¶ 1 (citing OKLA. STAT. tit. 70, § 17-101 *et seq.*) As governmental plans, they are exempt from ERISA, so Meadors' ERISA breach of fiduciary duty claim fails as a matter of law.

## PROPOSITION VI

### Meadors Cannot Recover Punitive Damages against the District

Meadors requests punitive damages against the District. However, federal law expressly disallows an award of punitive damages from a political subdivision on a Title VII claim. 42 U.S.C. § 1981a(b)(1). The District is a political subdivision and therefore cannot be held liable for punitive damages. OKLA. STAT. tit. 51, § 152(11)(b). Moreover, punitive damages are not available under the ADEA, *Bruno v. Western Elec. Co.*, 829 F.2d 957, 966-67 (10th Cir. 1987), or for violation of due process under federal or state law. *Dill v. City of Edmond*, 155 F.3d 1193, 1210 (10th Cir.

1998); OKLA. STAT. tit. 51, § 154(C). Accordingly, Meadors cannot recover punitive damages against the District, and summary judgment should be entered in favor of the District's on his punitive damages claim.

## Conclusion

To the extent that Meadors relies on events that occurred more than 300 days before the filing of his charge of discrimination with the EEOC (*i.e.*, before February 7, 2020), the District is entitled to summary judgment because those claims are time barred. The undisputed facts clearly demonstrate that neither Meadors' age, nor his reporting his supervisors' suspected sexual harassment/misconduct, played any role in the District's Reorganization or refusal to hire him as a SSO. Even assuming Meadors can bring forth direct or circumstantial evidence to establish a prima facie case of age discrimination or retaliation, based on the District's total experience with him as an employee, the undisputed facts clearly demonstrate that Meadors was simply not a good fit for the new SSO position, and the District genuinely believed its reasons not to hire him were legion—each was factual, demonstrable, legitimate, and non-discriminatory. Finally, because Meadors' retirement and health insurance plans are "government plans," his ERISA claims also fail. For the foregoing reasons, the School District's motion for summary judgment should be granted.

Respectfully submitted,


*s/* M. Scott Major
**Eric D. Wade, OBA No. 19249**
**M. Scott Major, OBA No. 33957**
**ROSENSTEIN, FIST & RINGOLD**
**525 South Main, Suite 700**
**Tulsa, OK 74103**
**(918) 585-9211 – telephone**
**(918) 583-5617 – facsimile**
**ericw@rfrlaw.com**
**scottmajor@rfrlaw.com**

**ATTORNEYS FOR DEFENDANT**

35

## CERTIFICATE OF DELIVERY

☒    I hereby certify that on the 3rd day of November, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

James O. Goodwin
PO Box 3267
Tulsa, OK 74101-3267
jgoodwin@theoklahomaeagle.net


 _s/_ M. Scott Major_____
M. Scott Major